1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

BRENTON E. JAMES, JR.,

11

       Plaintiff,                  No. CIV S-08-2851 GGH

12

    vs.

13

MICHAEL J. ASTRUE,          <u>ORDER</u>

14

Commissioner of
Social Security,

15

       Defendant.

16

_____/

17

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18

Security ("Commissioner") denying his application for Supplemental Security Income ("SSI")

19

under Title XVI of the Social Security Act ("Act").

20

       For the reasons that follow, plaintiff's Motion for Summary Judgment is granted,

21

the Commissioner's Cross Motion for Summary Judgment is denied, and this case is remanded to

22

the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further development and

23

reconstruction of the record.

24

<u>BACKGROUND</u>

25

       Plaintiff was born on July 6, 1973.  (Tr. at 33).  Plaintiff applied for disability

26

benefits on September 26, 2005.  (Tr. at 47).  Plaintiff alleged that he was unable to work due to

1

1  severe neck and back pain, leg injury, weakness on left side, gout and arthritis in both feet and

2  diabetes.  (Tr. at 41. )  In a decision dated February 20, 2008, ALJ L. Kalei Fong made the

3  following findings:[1]

4      1.  The claimant met the insured status requirements of the
          Social Security Act through December 31, 2005.

5

6      2.  The claimant has not engaged in substantial gainful activity
          since April 19, 2000, the alleged onset date (20 CFR
          404.1520(b), 404,1571 *et seq*., 416.920(b) and 416.971 *et*

7          *seq*.).

8      3.  The claimant has the following severe impairments:
          diabetes, hypertension, herniated cervical disc, seizures,

9          headaches, lumbago and obesity.  (20 CFR 404.1520(c) and
          416.920(c)).

10

11      4.  The claimant does not have an impairment or combination
          that meets or medically equals one of the listed

12

13   [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to

14  disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in
part, as an "inability to engage in any substantial gainful activity" due to "a medically

15  determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
A parallel five-step sequential evaluation governs eligibility for benefits under both programs.

16  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

17     Step one:  Is the claimant engaging in substantial gainful
activity?  If so, the claimant is found not disabled.  If not, proceed
to step two.

18     Step two:  Does the claimant have a "severe" impairment?
If so, proceed to step three.  If not, then a finding of not disabled is

19  appropriate.
     Step three:  Does the claimant's impairment or combination

20  of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
404, Subpt. P, App.1?  If so, the claimant is automatically

21  determined disabled.  If not, proceed to step four.
     Step four:  Is the claimant capable of performing his past

22  work?  If so, the claimant is not disabled.  If not, proceed to step
five.

23     Step five:  Does the claimant have the residual functional
capacity to perform any other work?  If so, the claimant is not

24  disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25   The claimant bears the burden of proof in the first four steps of the sequential evaluation
process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden

26  if the sequential evaluation process proceeds to step five.  Id.

1   impairments in 20 CFR Part 404, Subpart P, Appendix 1
(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),

2   416.925 and 416.926).

3        5.     After careful consideration of the entire record, the
undersigned finds that the claimant has the residual

4   functional capacity to perform light work tasks that allow
for the avoidance of hazardous heights and machinery.

5

6        6.     The claimant is unable to perform any past relevant work (20 CFR
404.1565 and 416.965).

7        7.     The claimant was born on July 6, 1973, and was 26 years old, which is
defined as a younger individual age 18-49, on the alleged disability onset

8   date (20 CFR 404.1563 and 416.963).

9        8.     The claimant has a high school education and is able to communicate in
English.  (20 CFR 404.1564 and 416.964).

10

11       9.     Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not the

12   claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404,
Subpart P, Appendix 2).

13

14      10.    Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR 404.1560(c),

15   404.1566(c), and 416.966).

16      11.    The claimant has not been under a disability as defined by the Social
Security Act, from April 19, 2000 through the date of this decision (20

17   CFR 404.1520(g) and 416.920(g)).

18   (Tr. at 17-23.)

19   <u>ISSUE PRESENTED</u>

20        Plaintiff has raised the following issues: A) whether the ALJ failed to develop the

21   record by failing to recontact Dr. Martin for clarification; B) whether the ALJ failed to credit

22   plaintiff's testimony and third party statements regarding his pain and functional limitations

23   without clear and convincing reasons for doing so; C) whether the ALJ failed to properly assess

24   plaintiff's Residual Functional Capacity (RFC), failed to utilize the expertise of a vocational

25   expert, and as a result found plaintiff capable of performing light work.

26   /////

1   LEGAL STANDARDS

2          The court reviews the Commissioner's decision to determine whether (1) it is

3   based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

4   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

5   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

6   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

7   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

8   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

9   is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

10  ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

11  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

12  rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

13  ANALYSIS

14         A.  Whether the ALJ Failed to Develop

15         Plaintiff argues that the ALJ failed to develop the record by recontacting the

16  consulting physician, Dr. Martin, for clarification of his report.  Dr. Martin's report is the only

17  report in the record by either a consulting or treating physician.

18         An ALJ has an independent duty to develop the record when there is ambiguous

19  evidence or when the record is inadequate to allow for proper evaluation of the evidence.  Mayes

20  v. Massanari, 276 F.3d 453,459 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

21  Cir. 2001);[2] Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).  The ALJ also has an

22

23         [2]  As the Ninth Circuit summarized in Tonapetyan, 242 F.3d at 1150 (citations and
    internal quotations omitted):
24
25         The ALJ in a social security case has an independent duty to fully and fairly
           develop the record and to assure that the claimant's interests are considered.  This
           duty extends to the represented as well as to the unrepresented claimant. . . . The
26         ALJ's duty to develop the record fully is also heightened where the claimant may

independent duty to contact reporting medical sources to resolve ambiguities and adequately

evaluate the evidence. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1); Social Security Ruling SSR

96-5p ("For treating sources, the rules also require that we make every reasonable effort to

recontact such sources for clarification when they provide opinions on issues reserved to the

Commissioner and the bases for such opinions are not clear to us").

           Dr. Martin examined plaintiff on April 25, 2007.  (Tr. at 207).  He was not

provided with any of plaintiff's medical records.  (Tr. at 207.)  Dr. Martin stated that plaintiff's

chief complaints were diabetes, headaches and low back pain.  (Tr. at 207.)  Dr. Martin's report

contains plaintiff's description of his medical history:

> Claimant reports being identified and treated for diabetes about 2004.  Emergency room attention and hospitalization was required at that time due to extremely high blood sugar and subsequent ER visits had been required due to similar elevations. Medication compliant was report[ed] to be good and claimant has apparently not been identified to have related end-organ damage.  The claimant has not had heart attack and does not experience angina.  The claimant has been using insulin recently and checks fingersticks about once a day, which run approximately 230. The claimant reports occasionally forgetting to take my "insulin."  A recent ophthalmologic check was "O.K."
>
> The claimant notes frequent headaches for the last four years for which some sort of evaluation seems to have occurred.  The claimant suspects it relates to low back injury, which was evaluated at one point and this included imaging.  Axial spine injections have been given which offered little relief.  Two collapsed discs have been identified.  Weakness, numbness, radiation, and incontinent were not reported and no additional specific treatment is scheduled at this time.  The claimant has been instructed to avoid foods such as "beef and hamburger" and these dietary maneuvers seem to curtail arthralgies and flares.
>
> The claimant has been treated for which sounds like essential hypertension as well since 2004 without objective evidence of related end organ damage.

(Tr. at 207.)

---

be mentally ill and thus unable to protect her own interests.  Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry.  The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.

In his report, Dr. Martin made the following observations.  He noted that plaintiff had no obvious difficulty getting on or off the examining table or moving about the site.  (Tr. at 207).  Plaintiff did not use any assistive devices.  (Tr. at 207.)  The cardiac examination of plaintiff revealed a regular rate and rhythm without murmurs, rubs or gallops.  (Tr. at 208.) Plaintiff did not grimace or make pain vocalizations during the musculoskeletal examination. (Tr. at 208.)  The examination of plaintiff's cervical spine revealed the following results:

| Movement | Observed Degrees of Movement | Normal |
|---|---|---|
| forward flexion | 45 | 50 |
| extension | 30 | 60 |
| right lateral flexion | 45 | 45 |
| left lateral flexion | 45 | 45 |
| right rotation | 60 | 80 |
| left rotation | 60 | 80 |

(Tr. at 208.)

The examination of plaintiff's dorsolumbar spine revealed the following results:

| Movement | Observed Degrees of Movement | Normal |
|---|---|---|
| flexion | 60 | 90 |
| extension | 25 | 25 |
| right lateral flexion | 25 | 25 |
| left lateral flexion | 25 | 25 |

(Tr. at 208.)

Dr. Martin found that plaintiff was able to squat and arise from the sitting position.  (Tr. at 208.)  His examination of plaintiff's shoulder revealed the following results:

| Movement | Observed Degrees of Movement | | Normal |
|---|---|---|---|
| | Right | Left | |
| abduction | 150 | 90 | 150 |
| adduction | 30 | 30 | 30 |
| forward elevation | 150 | 90 | 150 |
| extension | 40 | 40 | 40 |

(Tr. at 208.)

The results of the examinations of plaintiff's elbow, wrist, hip, knee and ankle were all within the normal range.  (Tr. at 208-209.)

6

1    Regarding plaintiff's extremities, Dr. Martin found no peripheral edema,

2    significant varicosities, clubbing, ulcerations or secondary skin changes.  (Tr. at 209.)  He found

3    no obvious muscular asymmetry or atrophy.  (Tr. at 209).  He found tinea changes on the plantar

4    surfaces, but no obvious tophi were appreciated.  (Tr. at 209.)

5    Plaintiff's gait was grossly normal; plaintiff's cranial nerves were grossly intact;

6    plaintiff's motor skills were grossly normal; plaintiff's strength test was within the normal range.

7    (Tr. at 209.)

8    Dr. Martin's assessment of plaintiff's medical issues was as follows: 1)

9    hypertension; 2) diabetes mellitus; 3) recurrent cephalalgia; 4) (possible) seizure disorder; 5)

10   gout, by report; 6) obesity/deconditioned state; 7) chronic lumbago.  (Tr. at 209.)

11   In his conclusion, Dr. Martin found as follows:

12   Per DDS guidelines, based on the objective findings and available information at
     the time of this examination, I find no functional restrictions attributable to
13   medication conditions for age and habitus appropriate activities.  Seizure
     precautions would apply and hazardous activities should be fully avoided.
14   Although based on objective findings alone only the aforementioned impairments
     were noted, I suspect based on the claimant's complaints that the claimant may
15   have difficulty maintaining employment.  The claimant would likely benefit from
     weight reduction.
16

17   (Tr. at 209.)

18   The ALJ found Dr. Martin's opinion regarding plaintiff's employability to be

19   ambiguous:

20   The undersigned has considered Dr. Martin's assessment during deliberation and
     finds Dr. Martin's conclusion as to the claimant's employability somewhat
21   ambiguous in light of the lack of objective findings upon such examination and
     Dr. Martin's previously stated opinion that the claimant had no functional
22   restrictions posed by medical conditions.

23   (Tr. at 21-22.)

24   Plaintiff argues that the ALJ should have developed the record and recontacted

25   Dr. Martin for clarification of his opinion that plaintiff may have difficulty maintaining

26   employment because 1) Dr. Martin was the only treating or examining physician to offer an

7

assessment regarding plaintiff's functional ability; 2) Dr. Martin had no medical records to review in assessing plaintiff's RFC; and 3) Dr. Martins' report was internally inconsistent.

In order to determine whether the ALJ should have developed the record, the undersigned has carefully reviewed the medical records in the file.  These records are summarized in chronological order below.

Plaintiff alleges that he became disabled in 2000.  (Tr. at 47.)  In 2003, plaintiff had cervical fusion surgery.  (Tr. at 105.) The medical records in the file date from late 2004.  Apparently, plaintiff's earlier medical records were misplaced by the Social Security Administration.  (Tr. at 104).  Included in the instant record are case agency notes summarizing some of these earlier records.  The undersigned will discuss some of these notes in order to put plaintiff's medical history in context.

A case agency note dated July 2003 mentions plaintiff's fusion surgery:

> c spine rom excellent, strength, 5/5 sensory intact lumbar able to heel/toe and tandem, WT 308# grip lt 60#s rt 150#s xrays show excellent alignment of c-spine and solid fusion at c3-4 and 4-5 DX s/p c3-5 acdf w iliac crest bone graft, lumbar spondylosis w radiculopathy.

(Tr. at 105.)

A case agency note dated September 2003 discusses an MRI and CT scan showing bulging and protruding discs:

> C/O multiple physical musculo problems + anxiety and depression.  Clmt ambulating with cane to minimize buckling of knees/legs.  Diffuse neck tenderness with spasms, ROM 80%.  T & L-spine tenderness with spasms in L-spine.  Severe limited elevation of shoulders.  Pain with ROM knee coupled with buckling sensation.  Neuro intact.  MRI shows L5-S1 disc protrusion, CT shows bulging L4-5, L5-S1.  MRI of knee NML.  NCV shows radiculopathy in LE's and neuropathy UE's.  MSS: No climbing, lifting, pushing, pulling.  No long walking or standing, no repetitive neck movements or back motions.

(Tr. at 105.)

A case agency note dated November 2003 states that plaintiff complained of burning in his shoulders and numbness in his left hand.  (Tr. at 105.)  A decreased flexion of the

1  neck was noted as well as decreased rotation due to pain.  (Tr. at 105.)  Plaintiff's gait was

2  normal and "surgically clmt stable."  (Tr. at 105.)

3        The agency notes state that in January 2004, plaintiff was admitted for an

4  overdose.  (Tr. at 105.)  No other agency notes are included for the rest of 2004.

5        The medical records before the undersigned dating from December 2004 are

6  records from plaintiff's visits to the emergency room at several hospitals as well as records from

7  the Del Paso Health Center, where his primary care physician was Dr. Clark.

8        On December 23, 2004, plaintiff was seen at the emergency room at Sutter

9  Hospital.  (Tr. at 253.)  Plaintiff stated that he hit his head against a light rail car.  (Tr. at 25.)

10       On July 12, 2005, plaintiff went to the Sutter Hospital emergency room

11  complaining of tingling and numbness in his fingertips, blurry vision for the last few days and

12  weakness on his left side.  (Tr. at 279.)  Plaintiff also stated that he had a history of significant

13  chronic back pain and that his current medications were Elavil, Soma, Vicodin and Valium.  (Tr.

14  at 279.)   A CT of his brain taken on that date showed no acute intracranial pathology.  (Tr. at

15  276.)

16       The first record from the Del Paso Health Center is dated October 25, 2005.  (Tr.

17  at 171.)  On that date, plaintiff was seen by Dr. Clark as a new patient for neck and back pain.

18  (Tr. at 171).  Plaintiff complained that his hands and toes were numb.  (Tr. at 171.) He also

19  complained of weakness in his left side.  (Tr. at 171.)  Plaintiff was diagnosed with a cough,

20  poorly controlled diabetes mellitus (adult onset), hypertension, "DDD" cervical surgery, "DDD"

21  lumbar "bulge" and dyslipidemia (high cholesterol).  (Tr. at 170.)  Plaintiff's insulin dose was

22  increased and he was prescribed refills of Vicodin at 5 mg, soma and another drug the court

23  cannot make out.  (Tr. at 170.)  Plaintiff also received a refill of two other drugs the court cannot

24  make out.  (Tr. at 170).

25       On November 7, 2005, plaintiff went to the Sutter Hospital emergency room

26  complaining of blurry vision and a dry cough.  (Tr. at 271.)  He also stated that he was out of

1    insulin.  (Tr. at 271.)

2              On November 22, 2005, plaintiff was seen again at the Del Paso Health Center.

3    (Tr. at 169).  Dr. Desouza examined plaintiff.  (Tr. at 168.)  Plaintiff complained of feeling

4    shooting pain from his right shoulder to his right neck as well as in his right temple area.  (Tr. at

5    169.)  Plaintiff also complained of recent problems controlling his bowels and bladder.  (Tr. at

6    169.)  Plaintiff also complained of blurred vision.  (Tr. at 169.)  He was observed as walking and

7    moving around without difficulty.  (Tr. at 169.)  Plaintiff had normal range of motion in his

8    cervical spine and shoulders.  (Tr. at 168.)  Plaintiff was advised to sign a release for his medical

9    records regarding his fusion surgery so that they could be evaluated at the Del Paso Health

10   Center.  (Tr. at 168.)

11             On November 29, 2005, plaintiff brought some of his records from his surgery to

12   the Del Paso Health Center.  (Tr. at 166.)  His diabetes was diagnosed as uncontrolled.  (Tr. at

13   166.)  Plaintiff stated that he could not control it because he was homeless.  (Tr. at 166.)

14             On December 7, 2005, plaintiff went to the Del Paso Health Center complaining

15   of neck and back pain.  (Tr. at 165.)  He was seen by Dr. Clark.  (Tr. at 164).  The entry from that

16   date states that plaintiff reported that the surgery did not resolve his neck pain.  (Tr. at 164.)

17   Plaintiff complained of headaches.  (Tr. at 165.)  Plaintiff reported that his back was in constant

18   pain.  (Tr. at 164.)  Plaintiff was diagnosed with poorly controlled diabetes, chronic low back

19   pain, chronic neck pain, chronic head aches, being overweight and abusing drugs.  (Tr. at 164.)

20   Plaintiff was prescribed Vicodin at a dosage of 5/500, but not valium or soma.  (Tr. at 164.)

21   Plaintiff's insulin dosage was increased.  (Tr. at 164.)

22             On January 3, 2006, plaintiff went to the Del Paso Health Center complaining of

23   back problems, headaches and dizziness.  (Tr. at 163.)  He was seen by Dr. Clark.  (Tr. at 163).

24   Plaintiff's range of motion in his neck was 60 degrees.  (Tr. at 163.)  Plaintiff's lumbar range of

25   motion was 90 degrees for rotating right and left, 25 degrees for a side bend.  (Tr. at 163.)

26   Plaintiff was prescribed Vicodin.  (Tr. at 162.)  It appears that the dosage was increased from 5

mg to 7.5 mg.  (Tr. at 162.)

On January 30, 2006, plaintiff went to the Del Paso Health Center where he was seen by a doctor other than Dr. Clark.  (Tr. at 161.)  Plaintiff received refill prescriptions for Vicodin at 7.5 mg. and Elavil.  (Tr. at 161.)

On February 7, 2006, plaintiff went to the Del Paso Health Center where he complained of pain in his back, buttock, shoulders and everywhere.  (Tr. at 159.)  He was examined by Dr. Clark.  (Tr. at 159.)  Plaintiff also stated that he felt numbness in his left fingers, left foot and left side.  (Tr. at 159.)  Plaintiff was prescribed insulin, Vicodin at 7.5 mg and Elavil.  (Tr. at 159.)

On February 23, 2006, plaintiff appeared at the Health Center complaining of numbness in his left shoulder and right leg.  (Tr. at 158.)  While plaintiff was seen by Dr. Clark that day, an entry by perhaps the intake nurse states  "seems very drug seeking." (Tr. at 158.)  Plaintiff's right leg had full range of motion.  (Tr. at 157.)  However, he had difficulty walking.  (Tr. at 157.)  The entry also seems to state that plaintiff suffered a footdrop probably caused by permanent nerve damage.  (Tr. at 157.)

On February 23, 2006, plaintiff was seen in the emergency room at Sutter Roseville Medical Center.  (Tr. at 242.)  Plaintiff stated that he felt numbness at the top of his foot, episodic tingling sensations radiating toward his ankle and chronic back pain.  (Tr. at 232.)  Plaintiff was ambulating normally and used a cane.  (Tr. at 242.)  Plaintiff was diagnosed with peripheral neuropathy.  (Tr. at 243.)

On March 7, 2006, plaintiff was seen by Dr. Clark and reported that the numbness and strength in his right leg was 70% improved.  (Tr. at 156.)  On April 25, 2006, plaintiff was seen by Dr. Clark and reported no weakness or numbness in his right leg.  (Tr. at 154.)  Plaintiff reported back pain.  (Tr. at 154.)

Plaintiff missed appointments at the Del Paso Clinic on May 28, 2006, and August 15, 2006.  (Tr. at 153.)

1    On June 28, 2006, plaintiff was seen at the Sutter Hospital emergency room
2  complaining of having suffered a seizure.  (Tr. at 257.)  Plaintiff refused to give a urine specimen
3  and signed out against medical advice.  (Tr. at 257.)
4    On June 29, 2006, plaintiff was seen at the Mercy San Juan Hospital emergency
5  room complaining of lightheadedness and that he had suffered a seizure.  (Tr. at 211.)  Plaintiff
6  was diagnosed as suffering from chest pain and drug and alcohol abuse.  (Tr. at 211.)  A CT scan
7  of his brain was normal.  (Tr. at 214, 222.)  The seizure was thought to be a side effect from
8  drugs he was using.  (Tr. at 214.)
9    On September 8, 2006, plaintiff was seen by Dr. Clark.  (Tr. at 152.)  Plaintiff
10  reported steady back pain but that the numbness and weakness in his leg was almost recovered.
11  (Tr. at 152.)  Plaintiff's diabetes was diagnosed as out of control.  (Tr. at 152.)  Plaintiff's
12  prescriptions for Vicodin (no dosage given), Amitriptyline (i.e. Elavil) and insulin were refilled.
13  (Tr. at 152.)  On October 16, 2006, Dr. Clark refilled plaintiff's prescriptions for Vicodin at 7.5.
14  mg and Amitriptyline.  (Tr. at 150).
15    On November 13, 2006, Dr. Clark examined plaintiff.  (Tr. at 149-150.)
16  Plaintiff's diabetes was reported as out of control.  (Tr. at 148.)  Plaintiff was prescribed novolin
17  for his diabetes.  (Tr. at 148.)  Plaintiff reported jerking at night and gasping.  (Tr. at 148.)
18    On November 20, 2006, Dr. Clark examined plaintiff.  (Tr. at 147.)  Plaintiff's
19  diabetes had improved although he did not follow the Novolin directions.  (Tr. at 147.)
20  Plaintiff's Novolin prescription was increased.  (Tr. at 147.)  The entry also states, "Numb: still."
21  (Tr. at 147.)
22    On December 11, 2006, Dr. Clark examined plaintiff.  (Tr. at 146-147.)  Plaintiff
23  reported that his glucometer was broken so he could not measure his blood sugar levels.  (Tr. at
24  146.)  Plaintiff reported that his eyes were blurry.  (Tr. at 146).  Plaintiff stated that his left face
25  was numb when he planted his left foot.  (Tr. at 146.)  Dr. Clark ordered a refill of plaintiff's
26  Vicodin at 7.5 mg.  (Tr. at 145.)

12

1        On January 9, 2007, Dr. Clark examined plaintiff.  (Tr. at 144-145).  Plaintiff

2   reported that his eyes had cleared up and that the numbness he felt in his face was resolved. (Tr.

3   at 144.)  Plaintiff reported a flare up of pain in his left shoulder that increased when he pushed to

4   get up from a chair.  (Tr. at 144.)  Plaintiff reported persistent neck pain.  (Tr. at 144.)  Plaintiff

5   also reported that he was sleeping better and had more energy.  (Tr. at 144.)  Dr. Clark found that

6   plaintiff's diabetes was fairly controlled.  (Tr. at 143.)  He prescribed Vicodin for plaintiff.  (Tr.

7   at 143.)

8        On January 29, 2007, plaintiff went to the emergency room at Methodist Hospital.

9   (Tr. at 122.)  Plaintiff complained of low back pain and difficulty standing.  (Tr. at 122.)

10   Plaintiff was prescribed Valium and Dilaudid.  (Tr. at 120.)

11        On February 15, 2007, plaintiff was seen at the Clinic by a doctor other than Dr.

12   Clark.  (Tr. at 141.)  Plaintiff stated that he suffered too much pain and could not stand straight.

13   (Tr. at 141).  Plaintiff's Vicodin prescription was refilled.  (Tr. at 141.)  The entry also states that

14   he had signed a narcotics contract which the pharmacist told him he had broken.  (Tr. at 141.)

15   The pharmacist told plaintiff that he would not have other prescribers prescribing the same or

16   similar meds while the agreement was in effect.  (Tr. at 141.)

17        On February 21, 2007, Dr. Clark examined plaintiff.  (Tr. at 139-140).  Plaintiff

18   complained of neck and back pain and wanted to renew his narcotics contract.  (Tr. at 140).  He

19   also stated that in late January he moved some furniture.  (Tr. at 140.)  Dr. Clark had plaintiff

20   sign a new narcotics contract and prescribed Vicodin at 7.5 mg.  (Tr. at 139.)

21        On April 30, 2007, Dr. Clark examined plaintiff.  (Tr. at 138).  Plaintiff

22   complained of left shoulder and knee pain.  (Tr. at 138.)  He also reported that he had been to the

23   emergency room for back pain.  (Tr. at 138.)  Plaintiff's insulin and Vicodin prescriptions were

24   refilled.  (Tr. at 138.)

25        On May 23, 2007, Dr. Clark examined plaintiff.  (Tr. at 135-136.)  Plaintiff

26   complained of persistent neck pain.  (Tr. at 136.)  Dr. Clark prescribed Vicodin at 5 mg and

insulin.  (Tr. at 135).  On June 13, 2007, July 6, 2007, and September 12, 2007, Dr. Clark ordered plaintiff's Vicodin prescriptions refilled at 5 mg.  (Tr. at 135.)

On June 25, 2007, plaintiff went to the emergency room at Sutter General Hospital complaining of low back pain.  (Tr. at 182, 187).  He was prescribed Dilaudid and Toradol.  (Tr. at 188.)

On November 26, 2007, Dr. Clark examined plaintiff.  (Tr. at 132-131.)  At that time, plaintiff complained of burning shoulder pain.  (Tr. at 132.)  Plaintiff also reported that his neck pain was unchanged.  (Tr. at 132.)  Dr. Clark reported that plaintiff's diabetes was out of control and increased plaintiff's Vicodin to 7.5. mg.  (Tr. at 131.)

Plaintiff argues that the ALJ failed to develop the record by recontacting Dr. Martin for clarification of his report.  In particular, plaintiff challenges the ALJ's rejection of Dr. Martin's conclusion that based on *plaintiff's complaints*, he suspected that plaintiff may have difficulty maintaining employment.  Neither Dr. Martin, the ALJ nor plaintiff identify which complaints by plaintiff Dr. Martin is referring to.

In the section of the report titled "Chief complaints/allegations" Dr. Martin wrote, "diabetes, headaches and low back pain."  (Tr. at 207.)   Regarding diabetes, Dr. Martin wrote that "medication compliant was report[ed] to be good and claimant has not been identified to have related end-organ damage."  (Tr. at 207.)  Because plaintiff made no complaints regarding his diabetes, the undersigned finds that Dr. Martin's statement that plaintiff could not work based on his own complaints was not in reference to his diabetes.  Because plaintiff apparently told Dr. Martin that he suffered from back pain and headaches, the undersigned finds that these are the conditions on which Dr. Martin based the at-issue comment.  Dr. Martin's report references no other complaints by plaintiff regarding any of his other medical conditions.

Plaintiff first argues that the ALJ should have further developed the record because Dr. Martin had no medical records to review in assessing plaintiff.  The only medical records of which Dr. Martin was aware were those plaintiff told him about:

> The claimant notes frequent headaches for the last four years for which some sort of evaluation seems to have occurred.  The claimant suspects it relates to low back injury, which was evaluated at one point and this included imaging.  Axial spine injections have been given which offered little relief.  Two collapsed discs have been identified.  Weakness, numbness, radiation and incontinent were not reported and no additional specific treatment is scheduled at this time.

(Tr. at 207.)

Dr. Martin was apparently unaware of plaintiff's 2003 fusion surgery.  While he mentions two collapsed discs, he did not review the CT scan and MRI referred to in the September 2003 case notes that showed bulging at L4-5, L5-S1 and L5-S1 disc protrusion. In addition, Dr. Martin did not review plaintiff's medical records from the Del Paso Health Center which showed that beginning in October 2005 through November 2007, Dr. Clark routinely prescribed Vicodin for plaintiff's back and neck pain.  Dr. Martin was also apparently unaware of plaintiff's trips to the emergency room complaining of back pain during this time.  In addition, plaintiff apparently told Dr. Martin that he was not suffering from weakness, numbness, radiation or incontinence at the time of the examination.  However, plaintiff's medical records demonstrate that plaintiff previously complained of all of these conditions.

The fact that plaintiff was prescribed Vicodin for approximately two years by Dr. Clark for back pain is inconsistent with Dr. Martin's finding of no objective findings to support a finding of functional restrictions.  The 2003 MRI and CT scan showing disc bulges and protrusions, which were not addressed by the 2003 fusion surgery, may well be objective evidence of plaintiff's complaints of back pain.  Because of these ambiguities in the record, the ALJ should have recontacted Dr. Martin and provided him with plaintiff's medical records, including the 2003 MRI and CT scan.

For the reasons discussed above, this action is remanded for the ALJ to provide Dr. Martin with a copy of plaintiff's medical records, including the 2003 MRI and CT scan.  The ALJ shall reconstruct plaintiff's medical record in order to recover the missing 2003 MRI and CT scan as well as plaintiff's other missing medical records.  If the 2003 MRI and CT scan cannot be

located, the ALJ shall order a new MRI and CT scan to be conducted.  Reed v. Massanari, 270

F.3d 838, 841 (9th Cir. 2001) ("One of the means available to an ALJ is to supplement an

inadequate medical record is to order a consultative examination, i.e. "a physical or mental

examination of test purchased for [a claimant] at [the Social Security Administration's] request

and expense.' 20 C.F.R. §§ 404.1519, 416.919.")

Regarding plaintiff's headaches, Dr. Martin made no specific finding other than

that plaintiff suffered from recurrent cephalalgia.  (Tr. at 209.)  Dr. Martin stated that plaintiff

complained of frequent headaches for the last four years for which some sort of evaluation

seemed to have occurred.  (Tr. at 207.)  These were the only comments in his report regarding

headaches.  Apparently relying on sources other than Dr. Martin's report, the ALJ found that

plaintiff's headaches were controlled by medication.  (Tr. at 21.)

After reviewing the record, it is unclear what medication the ALJ is referring to.

As noted above, plaintiff was repeatedly prescribed Vicodin for lower back pain.  However, it is

unclear whether the Vicodin was also meant to treat the headaches and, if so, whether it was

successful.  The record regarding the treatment of plaintiff's headaches is inadequate for proper

evaluation of the evidence.  For that reason, this action is remanded for the ALJ to provide Dr.

Martin with all of the records, including those on which she relied for her finding that plaintiff's

headaches were controlled by medication.

Finally, in developing the record, nothing prevents the ALJ, or plaintiff's counsel,

from contacting Dr. Clark who appears to have been plaintiff's treating physician for a lengthy

period of time, and still may be his treating  physician.

B.  Whether the ALJ Failed to Credit Plaintiff's Testimony

Plaintiff argues that the ALJ failed to credit his testimony and the statements of

third parties made on his behalf.

The ALJ determines whether a disability applicant is credible, and the court defers

to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

16

1   94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

2   credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

3   Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

4   supported by "a specific, cogent reason for the disbelief").

5            In evaluating whether subjective complaints are credible, the ALJ should first

6   consider objective medical evidence and then consider other factors.  Vasquez v.  Astrue, 572

7   F.3d 586, 591 (9th Cir. July 8, 2009);  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en

8   banc).  The ALJ may not find subjective complaints incredible solely because objective medical

9   evidence does not quantify them.  Bunnell at 345-46.  If the record contains objective medical

10  evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

11  of the alleged symptoms, including aggravating factors, medication, treatment, and functional

12  restrictions.  See Vasquez, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

13  reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

14  explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

15  activities.[3]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61

16  FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

17  testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

18  and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

19  (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

20  v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

21  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

22  her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 572

23

24       [3]  Daily activities which consume a substantial part of an applicants day are relevant.
     "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
25   activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
     any way detract from her credibility as to her overall disability.  One does not need to be utterly
26   incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
     (quotation and citation omitted).

F.3d at 591, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d at 1282.  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

Plaintiff testified as follows regarding his injuries and pain.  Plaintiff testified that in 2000, he was injured while working as a delivery truck driver.  (Tr. at 329.)  He delivered televisions, VCRs, DVDs, microwaves and stereo systems.  (Tr. at 329.)  Plaintiff quit that job after he injured himself.  (Tr. at 331.)  He worked as a cashier for AM/PM briefly in 2004 but had to quit due to his medical problems.  (Tr. at 331.)  Plaintiff filed a worker's compensation lawsuit regarding the injuries he suffered in 2000 which settled for $80,000.  (Tr. at 331.)

Plaintiff testified that he suffers from excruciating neck pain every day.  (Tr. at 333).  Plaintiff testified that he had cervical fusion surgery in his neck and also suffers from bulging and protruding discs that cause pain in his hips.  (Tr. at 333.)  Plaintiff testified that his legs buckle when he walks so he uses a cane.  (Tr. at 333.)  He testified that his leg buckles whenever he stands up.  (Tr. at 339.)

His left hand is constantly numb while the numbness in his right hand comes and goes.  (Tr. at 334.)  The hand numbness goes away within hours.  (Tr. at 335.)  His right side is numb three to five times per month.  (Tr. at 334.)  He has trouble focusing due to the pain.  (Tr. at 333.)  He has blurred vision almost constantly every day due to his diabetes.  (Tr. at 333-334.)  He is dizzy three to five times every day.  (Tr. at 335.)  He feels fatigue every day and has trouble staying awake.  (Tr. at 336-337.)  Plaintiff testified that he had trouble controlling his blood sugar.  (Tr. at 333.)

Plaintiff suffers from headaches six or more times per week.  (Tr. at 337.)  The headaches can last for minutes to hours.  (Tr. at 337.)  Plaintiff also has jerking episodes.  (Tr. at 339.)

\\\\\

\\\\\

1       Regarding plaintiff's credibility, the ALJ stated:

2       After considering the evidence of record, the undersigned finds that the claimant's
        medically determinable impairments could reasonably be expected to produce the
3       alleged symptoms, but that the claimant's statements concerning the intensity,
        persistence and limiting effects of these symptoms are not entirely credible.  The
4       claimant alleges severe neck and back pain, leg injury, left-sided weakness,
        arthritis and diabetes.  The record shows that the claimant was involved in an on-
5       the-job accident in which he injured his back and neck; however, he underwent
        cervical diskectomy and fusion in 2003 which was deemed successful.  Despite
6       some weakness and pain, he is able to move about in a satisfactory manner and
        numbness, radiation and incontinence were not reported.  Gait is normal and the
7       claimant does not use an assistive device.  Muscle tone is normal and he has no
        strength deficits.  The claimant is diabetic and hypertensive, but these conditions
8       are controlled through medication regimes when the claimant is in compliance
        with such established programs and end organ damage has not developed.
9       Similarly headaches are under control through medication.  Despite being treated
        for a seizure in 2006, the record does no contain evidence of frequent debilitating
10      reoccurrences.  There has been no evidence of cardiac problems and the claimant
        remains neurologically intact. The claimant is obese which puts additional stress
11      on his neck, back and extremities and causes fatigue especially during activity.
        He has been advised by his treating physician to reduce his weight and address his
12      smoking habit, but the claimant has not as yet acted on such recommendations.

13      As for the opinion evidence, results of radiological studies have not revealed
        objective findings of a specific etiology for continued body weakness.  In June
14      2006, CT scans of the brain (Ex. 86F) and an ECG were formal (Ex. 96F).

15  (Tr. at 21).

16          Plaintiff first argues that the ALJ improperly rejected his testimony regarding back

17  pain based on her finding that the 2003 cervical disketomy and fusion was successful.  Plaintiff

18  argues that the ALJ must have inferred success from the Agency case entry dated July 2003

19  stating "x-rays show excellent alignment of c-spine and solid fusion at c3-4 and 405 DX s/p c3-5

20  acdf w iliac crest bone graft, lumbar spondylosis with radiculopathy."  (Tr. at 105.)  Plaintiff

21  argues that later Agency case entries indicate that plaintiff continued to suffer neck and back

22  pain.

23          As discussed above, an entry from September 2003 states that an MRI and CT

24  scan showed disc protrusion and bulging. (Tr. at 105.)  Plaintiff also reported spine and neck

25  tenderness and spasms. (Tr. at 105.)   Plaintiff argues that even if the cervical fusion was

26  successful, he still had bulging discs and protrusions which caused severe pain, spasms,

19

1  radiculopathy and neuropathy.  Plaintiff argues that whether the cervical surgery was successful

2  is irrelevant because it did not cure all of plaintiff's neck and back problems.

3          Plaintiff's current back pain may be caused by the bulging and protruding discs.

4  That plaintiff was prescribed Vicodin for two years by Dr. Clark is evidence that these conditions

5  are causing him to suffer significant back pain.  Whether the bulging and protruding discs may

6  cause the level of pain testified to by plaintiff requires further development of the record.  For

7  that reason, this claim is remanded so that the ALJ may reevaluate plaintiff's credibility

8  regarding back pain after reviewing Dr. Martin's supplemental report after his review of

9  plaintiff's medical records.

10         Plaintiff also argues that the ALJ improperly discredited his testimony by finding

11  no evidence that he suffered numbness, radiation and incontinence.  Plaintiff also argues that the

12  ALJ improperly discredited his testimony by finding that his gait was normal and he did not need

13  an assistive device.  Plaintiff argues that there was evidence in his medical records that he

14  suffered from numbness, radiation, incontinence, difficulty ambulating, buckling knees and that

15  he used a cane.

16         In making her findings regarding whether plaintiff suffered from numbness, etc.,

17  the ALJ was clearly relying on Dr. Martin's report which found that plaintiff did not suffer from

18  any of these afflictions and that he did not use a cane.  (Tr. at 207-209.)  However, the medical

19  records summarized above contain entries indicating that at various times, plaintiff suffered from

20  all of these problems.  Dr. Martin did not have these records at the time he examined plaintiff.

21  For that reason, the ALJ improperly relied on Dr. Martin's report in discrediting plaintiff's

22  testimony regarding these conditions.  Accordingly, this claim is remanded so that the ALJ may

23  reassess plaintiff's credibility regarding these matters following her review of Dr. Martin's

24  supplemental report.

25         Plaintiff next argues that the ALJ improperly rejected his testimony regarding the

26  extent he suffered headaches by finding that they were controlled with medication.  As discussed

20

1    above, the ALJ's finding that plaintiff's headaches were controlled by medication is not

2    supported by the record.  For that reason, the ALJ improperly rejected his testimony regarding

3    headaches.  Accordingly, this claim is remanded for the ALJ to reassess plaintiff's credibility

4    regarding headaches following her review of Dr. Martin's supplemental report.

5            Finally, the ALJ suggested that plaintiff's failure to follow the advice of his

6    treating physicians to reduce his weight undermined his credibility.  However, "the failure to

7    follow treatment for obesity tells us little or nothing about a claimant's credibility."  Orn v.

8    Astrue, 495 F.3d 625, 638 (9th Cir. 2007).  For this reason, the ALJ erred in finding plaintiff less

9    credible for failing to lose weight.  Accordingly, this action is remanded so that the ALJ may

10   reweigh plaintiff's credibility without considering his failure to lose weight.

11           Plaintiff next argues that the ALJ failed to consider letters from plaintiff's mother-

12   in-law, Kathy Harmon, and his former live-in girlfriend, Jennifer Jimenez.  Kathy Harmon's

13   letter stated, in relevant part,

14           I have known Brenton for the past 12 years as I am the Grandmother of his three
             children.  During that time he had worked at different jobs that required physical
15           ability and strength.  He participated in leisure sports playing basketball and
             wrestling with his children.  He assisted with caring for his children and normal
16           household duties.

17           Since his injury I have noticed a big change over the course of time and recovery.
             Normal everyday routines have become extremely difficult.  Even sitting on the
18           couch watching television becomes painful and he has difficulty holding up his
             head.  He [sic] knowledgeable on the computer but cannot sit any length of time
19           without being in pain.  He no longer can participate in sports or even extensive
             walking.  I have observed Brenton needing help with household duties such as
20           cleaning a bathroom, vacuuming and mopping a floor.

21   (Tr. at 58.)

22           Jennifer Jimenez's letter stated, in relevant part,

23           I've known Brenton off and on for over 20 years.  I saw him before the accident
             and after.  He has a lot of debilitating problems now that I could not imagine
24           having to live with.  His back usually always hurts.  Sometimes it's hard for him
             to stand up.  I would usually help him.  He can't walk or stand for extended
25           periods of time.  I have seen him have trouble holding his neck up.  He uses
             pillows or props to deal with it.  I have seen him lose his balance for no apparent
26           reason.  I have seen evidence of nerve damage.  Some nights he can't sleep

                                              21

1    because as soon as he starts to fall asleep his body twitches and he is awake again.
2    Several sleepless nights over pain.  He has had numbness in his finger tips.  We
     lived together so I saw these things first hand.  Something to deal with everyday.
3    Not just an ache or pain here and there it was all the time.  If he would turn his
     head a certain way a shooting pain would go down his arm.  I saw him frustrated
4    over the pain and having to deal with it all the time.  It's really hard to see
     someone you love go through this every single day and there is nothing you can do
5    about it.  I fear how bad it will get in the future.

6    (Tr. at 59.)

7              The ALJ did not mention these letters in her report.

8              Lay testimony as to a claimant's symptoms is competent evidence that an ALJ

9    must take into account, unless he expressly determines to disregard such testimony and gives

10   reasons germane to each witness for doing so. Stout v. Commissioner, 454 F.3d 1050, 1056 (9th

11   Cir. 2006) (citations omitted); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.2001); see also

12   Robbins v. Social Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (ALJ required to account for

13   all lay witness testimony in discussion of findings) (citation omitted). The standards discussed in

14   these authorities appear equally applicable to written statements. Cf. Schneider v. Commissioner

15   of Social Security Administration, 223 F.3d 968, 974-75 (9th Cir.2000) (ALJ erred in failing to

16   consider letters submitted by claimant's friends and ex-employers in evaluating severity of

17   claimant's functional limitations).

18             In cases in which "the ALJ's error lies in a failure to properly discuss competent

19   lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless

20   unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony,

21   could have reached a different disability determination." Robbins, 466 F.3d at 885 (quoting

22   Stout, 454 F.3d at 1055-56).

23             The statements of Kathy Harmon and Jennifer Jimenez supported petitioner's

24   testimony regarding the pain he experienced.  As discussed above, whether the ALJ properly

25   rejected petitioner's testimony requires further development of the record.  For that reason, the

26   undersigned cannot determine whether the ALJ's failure to consider these statements was

1    harmless error.  Accordingly, on remand, the ALJ shall consider the Harmon and Jimenez letters

2    when she reconsiders petitioner's credibility.

3                      C.   Whether the ALJ Failed to Properly Assess Plaintiff's RFC etc.

4                      Plaintiff argues that the ALJ failed to properly assess his RFC, failed to utilize the

5    expertise of a vocational expert and, as a result, improperly found him capable of performing

6    light work.  The ALJ found that plaintiff had the RFC to perform light work tasks that allowed

7    for the avoidance of hazardous heights and machinery.  (Tr. at 19.)

8                      At step four, the plaintiff has the burden of showing that he is no longer able to

9    perform his or her past relevant work.  Lewis v. Barnhart, 281 F.3d 1081, 1083 (9th Cir. 2002)

10   (citing Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001)).  The ALJ's determination at this

11   step must be based on an examination of plaintiff's "residual functional capacity and the physical

12   and mental demands" of the past relevant work.  Id. (quoting 20 C.F.R. §§ 404.1520(e) and

13   416.920(e)).

14                     RFC is an administrative assessment of the extent to which a claimant's medically

15   determinable impairment(s), including any related symptoms, such as pain, may cause limitations

16   or restrictions that may affect his or her capacity to do work-related activities.  See Social

17   Security Ruling FN6 96-8p; see also 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  "Ordinarily,

18   RFC is the [claimant's] maximum remaining ability to do sustained work activities in an ordinary

19   work setting on a regular and continuing basis[.]" SSR 96-8 (emphasis in original).  RFC

20   represents the most that an individual can do despite his or her limitations or restrictions.  Id.

21   The RFC assessment must be based on all of the relevant medical and other evidence in the case

22   record, such as medical history, medical signs and laboratory findings, the effects of treatment,

23   reports of daily activities, recorded observations, medical source statements, and effects of

24   symptoms.  See SSR 96-8p.  "The RFC assessment must always consider and address medical

25   source opinions." SSR 96-8p.  "Medical opinions are statements from physicians and

26   psychologists or other acceptable medical sources that reflect judgments about the nature and

                                                           23

severity of [claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  It is the ALJ's duty to evaluate the medical opinions in the record and to explain the weight given to each medical opinion.  <u>See</u> 20 C.F.R. §§ 404.1527(d), 416.927(d).

Plaintiff argues that in reaching the RFC determination, the ALJ failed to characterize the medical evidence and improperly rejected his testimony.  As discussed above, this action is remanded for further development of the record and so that the ALJ may reassess plaintiff's credibility based on the newly developed record.  On remand, the ALJ will be required to reassess plaintiff's RFC based on the new evidence.  For that reason, the undersigned need not consider whether the ALJ failed to properly assess plaintiff's RFC.

In sum, the court finds the ALJ's assessment is not fully supported by substantial evidence in the record and based on the proper legal standards.  Accordingly, for the reasons that follow, plaintiff's Motion for Summary Judgment is granted, the Commissioner's Cross Motion for Summary Judgment is denied; this case is remanded to the Commissioner pursuant sentence four of 42 U.S.C. § 405(g) for further development of the record regarding plaintiff's back pain and headaches; the ALJ shall also reassess plaintiff's credibility and consider the two lay person letters in the record; the ALJ shall reassess plaintiff's RFC, if appropriate.

DATED: 03/04/2010

/s/ Gregory G. Hollows

U.S. MAGISTRATE JUDGE

james.ss(2)